**NOT YET SCHEDULED FOR ORAL ARGUMENT**

No. 17-7051

# In the United States Court of Appeals for the District of Columbia Circuit

————————————

SPANSKI ENTERPRISES, INC.
PLAINTIFF-APPELLEE

*v.*

TELEWIZJA POLSKA S.A.,
DEFENDANT-APPELLANT

————————————

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA (CIV. NO. 12-957)
(THE HONORABLE TANYA S. CHUTKAN, J.)*

————————————

**BRIEF OF AMICI CURIAE
DISNEY ENTERPRISES, INC., TWENTIETH CENTURY FOX FILM CORPORA-
TION, WARNER BROS. ENTERTAINMENT INC.,
RECORDING INDUSTRY ASSOCIATION OF AMERICA, INC., AMERICAN ASSO-
CIATION OF INDEPENDENT MUSIC, AND NATIONAL MUSIC PUBLISHERS'
ASSOCIATION IN SUPPORT OF PLAINTIFF-APPELLEE**

————————————

THOMAS G. HENTOFF
CONNOR S. SULLIVAN
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000
Counsel for Amici Curiae

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), amici curiae make the following certification:

**(A)   Parties, Intervenors, and Amici.**  Except for the following, all parties, intervenors, and amici appearing before the district court and in this court are listed in the Brief for Defendant-Appellant.

Amici for Plaintiff-Appellee in this Court are Disney Enterprises, Inc., Twentieth Century Fox Film Corporation, Warner Bros. Entertainment Inc., the Recording Industry Association of America, Inc., the American Association of Independent Music, and the National Music Publishers' Association.

**(B)   Rulings Under Review.**  References to the rulings at issue appear in the Brief for Defendant-Appellant.

**(C)   Related Cases.**  The case on review has not previously been before this Court or any other court.  To the best of the knowledge of amici curiae and their counsel, no related cases are currently pending in this Court or in any other federal court of appeals, or in any other court in the District of Columbia.

/s/ Thomas G. Hentoff
THOMAS G. HENTOFF
*Counsel for Amici Curiae*

i

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT
## AND RULE 29(a)(4)(E) STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, the undersigned attorney of record for amici curiae certifies as follows:

1.     Disney Enterprises, Inc. is a wholly owned subsidiary of The Walt Disney Company, a publicly held company.

2.     Twentieth Century Fox Film Corporation is an indirect, wholly owned subsidiary of Twenty-First Century Fox, Inc., a publicly held company.

3.     Warner Bros. Entertainment Inc. is an indirect, wholly owned subsidiary of Time Warner Inc., a publicly held company.

4.     The Recording Industry Association of America, Inc., has no parent corporation, and no publicly held company holds more than 10% of its stock.

5.     The American Association of Independent Music has no parent corporation, and no publicly held company holds more than 10% of its stock.

6.     The National Music Publishers' Association has no parent corporation, and no publicly held company holds more than 10% of its stock.

7.     No party's counsel authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person, other than amici curiae, their

members, or their counsel, contributed money that was intended to fund preparing or submitting this brief. *See* Fed. R. App. P. 29(a)(4)(E).

/s/ Thomas G. Hentoff
THOMAS G. HENTOFF
*Counsel for Amici Curiae*

# TABLE OF CONTENTS

STATEMENT OF INTEREST.................................................................1

INTRODUCTION AND SUMMARY OF THE ARGUMENT .......................4

ARGUMENT ...................................................................................6

    I.    United States Copyright Law Applies To Public Performances Transmitted for Receipt Within the United States. ......................6

        A.    U.S. Copyright Law Protects the Performance Rights of Copyright Owners in Performances Transmitted for Receipt Inside the United States..........................................6

        B.    The Text and Purpose of the Copyright Act Support Applying U.S. Copyright Law to Unauthorized Public Performances Transmitted for Receipt Inside the United States.......................................................................11

    II.    There Is No "Volitional Conduct" Requirement That Excuses A Defendant From Direct Copyright Infringement Liability For Operating a Video-On-Demand Service..................................14

        A.    Establishing Direct Copyright Infringement Requires, at Most, Proof of Causation, Not "Volition." ......................15

        B.    A Service That Transmits Programming to Users Over the Internet Satisfies Any Causation Requirement for Violation of the Public Performance Right..........................21

        C.    A Defendant's Automation of Infringing Conduct Is No Defense to Direct Infringement..........................................25

        D.    A Defendant's Operation of a Video-on-Demand Service Where It Selects the Programming Is a Classic Example of Direct Infringement........................................................27

CONCLUSION................................................................................29

iv

# TABLE OF AUTHORITIES

## CASES

*A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001)..........15, 16

*American Broadcasting Cos. v. Aereo, Inc.*,
    573 U.S. __, 134 S. Ct. 2498 (2014)..........................................................passim

*BWP Media USA, Inc. v. T & S Software Assocs., Inc.*,
    852 F.3d 436 (5th Cir. 2017)..............................................................................20

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.*,
    536 F.3d 121 (2d Cir. 2008) ("*Cablevision*") ......................................17, 18, 28

*CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544 (4th Cir. 2004)....................20

*Crunchyroll, Inc. v. Pledge*, 2014 WL 1347492 (N.D. Cal. Mar. 31, 2014)......10

*EMI Christian Music Group, Inc. v. MP3tunes, LLC*,
    844 F.3d 79 (2d Cir. 2016) ...................................................................26, 27, 28

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991)......................15

*Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390 (1968).....22

*Fox Television Stations, Inc. v. FilmOn X LLC*,
    150 F. Supp. 3d 1 (D.D.C. 2015) .............................................................24, 25

*Los Angeles News Service v. Conus Communications Co.*,
    969 F. Supp. 579 (C.D. Cal. 1997) .......................................................9, 10, 12

*MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005) ...............................16

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007)...............27

*Perfect 10, Inc. v. Giganews, Inc.*, 2014 WL 8628034
    (C.D. Cal. Nov. 14, 2014) ..................................................................................19

*Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657 (9th Cir. 2017).................19, 20

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788 (9th Cir. 2007)............10

*Quantum Sys. Integrators, Inc. v. Sprint Nextel Corp.*,
    338 F. App'x 329 (4th Cir. 2009)......................................................27

*Religious Technology Center v. Netcom On-Line Communication Services,
    Inc.*, 907 F. Supp. 1361 (N.D. Cal. 1995) ......................15, 16, 18, 19

*Shropshire v. Canning*, 809 F. Supp. 2d 1139 (N.D. Cal. 2011) .......................10

*Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*,
    689 F.3d 29 (1st Cir. 2012) ........................................................17, 28

*Sony Corp. of America v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984)......................................................................16

*Stenograph L.L.C. v. Bossard Assocs., Inc.*, 144 F.3d 96 (D.C. Cir. 1998) .....15

*Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.*,
    24 F.3d 1088 (9th Cir. 1994) (en banc)...............................................7

*Teleprompter Corp. v. Columbia Broadcasting System, Inc.*,
    415 U.S. 394 (1974)......................................................................22

*Twentieth Century Fox Film Corp. v. iCraveTV*,
    2000 WL 255989 (W.D. Pa. Feb. 8, 2000) .....................................8, 9

*Warner Bros. Entm't Inc. v. WTV Sys., Inc.*,
    824 F. Supp. 2d 1003 (C.D. Cal. 2011) ...........................................19

## STATUTES AND LEGISLATIVE HISTORY

17 U.S.C. § 101 .........................................................................................6, 22

17 U.S.C. § 106 .......................................................................................passim

17 U.S.C. § 501(a)........................................................................................11

17 U.S.C. § 512 .............................................................................................16

H.R. Rep. No. 94–1476 (1976)........................................................................23

## OTHER AUTHORITIES

Digital Entertainment Group, *Home Entertainment Report* (Jan. 6, 2017)....3

Joshua P. Friedlander, *News and Notes on 2017: Mid-Year RIAA Revenue Statistics* ...........................................................................2, 3

Rebecca Giblin & Jane C. Ginsburg, *We (Still) Need To Talk About Aereo: New Controversies and Unresolved Questions after the Supreme Court Decision*, 38 Colum. J.L. & Arts 109 (2015) ....................................17

Jane C. Ginsburg, *Extraterritoriality and Multiterritoriality in Copyright Infringement*, 37 Va. J. Int'l L. 587 (1997) ..................................8, 13

2 Paul Goldstein, *Goldstein on Copyright* § 7.0.2 (3d ed. Supp. 2017).......18, 27

4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright,* § 13.08[C] (rev. ed. 2017).................................................................17, 18, 19, 20

5 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 17.02 (rev. ed. 2017) ......................................................................7, 8

Office of the U.S. Trade Representative, *2016 Out-of-Cycle Review of Notorious Markets* (Dec. 2016)........................................3, 12, 13

*Webster's Third New Int'l Dictionary* 2562 (1986) ............................................20

## GLOSSARY OF ABBREVIATIONS

A2IM: American Association of Independent Music

ISP: Internet service provider

NMPA: National Music Publishers Association

RIAA: Recording Industry Association of America

SEI: Spanski Enterprises, Inc.

TVP: Telewizja Polska S.A.

## STATEMENT OF INTEREST

Amici Disney Enterprises, Inc., Twentieth Century Fox Film Corporation, and Warner Bros. Entertainment Inc. and/or their affiliated companies own or control the copyrights in, and are among the leading producers and distributors of, some of the most popular and critically acclaimed motion pictures and television programs in the world. They and their affiliates distribute their content in the theatrical, television, and home entertainment markets in all formats and all channels of distribution, including online distribution.

Amicus Recording Industry Association of America, Inc. ("RIAA") is the trade organization that supports and promotes the creative and financial vitality of the major recorded music companies. Amicus American Association of Independent Music ("A2IM") is a nonprofit trade organization representing a broad coalition of over 400 independently owned U.S. music labels. RIAA and A2IM's members collectively create, manufacture, and/or distribute nearly 100% of all sound recordings legitimately produced and sold in the United States. RIAA and A2IM's members depend on copyrights to protect the recorded music in which they have invested and created in collaboration with musicians, songwriters, and other artists. Amicus National Music Publishers Association ("NMPA"), founded in 1917, is the principal trade association representing the U.S. music publishing and songwriting industry. NMPA protects

1

and advances the interests of music publishers and songwriters in matters relating to both the domestic and global protection of music copyrights. NMPA represents publishers and songwriters of all catalog and revenue sizes, from large international corporations to small businesses and individuals. Taken together, compositions owned or controlled by NMPA members account for the vast majority of the market for musical composition licensing in the U.S.

Amici and the members of amici RIAA, A2IM, and NMPA depend upon the protection afforded by the U.S. Copyright Act to ensure the continued creation and availability of their works. Amici accordingly have a strong interest in the proper interpretation of the rights of copyright owners under the Copyright Act, including regarding when acts of copyright infringement occur in the United States and thus are covered by the Act, and when services that publicly perform copyrighted works are liable for direct infringement of copyright.

Internet streaming of movies, television programming, other audiovisual works, and recorded music is a large and growing part of the U.S. economy and has become vitally important to the economic health of the U.S. media and entertainment industries. For example, revenues from streaming music services accounted for more than 60% of the total market for recorded music in the first half of 2017, *see* Joshua P. Friedlander, *News and Notes on 2017: Mid-*

*Year RIAA Revenue Statistics*, http://tinyurl.com/17-7051Amicus1, and revenues from subscription streaming of movies, television programs, and other audiovisual works jumped by more than 22% year over year in 2016, Digital Entertainment Group, *2016 Home Entertainment Report* (Jan. 6, 2017), http://tinyurl.com/17-7051Amicus2.

At the same time, piracy via internet streaming is rampant, and therefore posing an increasing threat to the media and entertainment industries. For example, according to a recent Piracy Analysis of comScore data by NetNames, visits to pirate streaming sites accounted for nearly 60% of the traffic to sites used to obtain illicit motion picture and television content online in June 2017 (with pirated downloads accounting for the rest). Streaming piracy facilitated by companies based overseas is a particular problem. The United States Trade Representative's 2016 review of "notorious markets," which are defined as "marketplaces that reportedly engage in and facilitate substantial copyright piracy," agreed that "[s]treaming sites . . . are overtaking . . . other piracy sites as the primary mode of movie and television piracy." Office of the U.S. Trade Representative, *2016 Out-of-Cycle Review of Notorious Markets* 1, 11 (Dec. 2016) ("*Notorious Markets*"), http://tinyurl.com/17-7051Amicus3; *see id.* at 7, 9 (discussing substantial infringement of music committed via overseas streaming sites). Maintaining an effective enforcement regime against such copyright infringement is essential for the continued health of the media

3

and entertainment industries and the continued availability to American con-
sumers of diverse and high-quality video programming and music.

Accordingly, businesses in the media and entertainment industries
would be harmed, and jobs would be lost, if the legal arguments advanced by
Defendant-Appellant Telewizja Polska S.A. ("TVP") were accepted, namely,
its requests for a rule that would permit infringers to skirt liability for direct
copyright infringement by locating their servers outside the United States and
for a rule immunizing infringers from direct liability if they operate an auto-
mated, "on-demand" service.  For these reasons, amici submit this brief in sup-
port of Plaintiff-Appellee Spanski Enterprises, Inc. ("SEI").

## STATUTES INVOLVED

All applicable statutes are contained in the Brief for Defendant-Appel-
lant.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Defendants infringe the public performance right when they transmit
performances of copyrighted works for viewing inside the United States,
irrespective of where those transmissions originate.  Contrary to TVP's
assertion, the doctrine of extraterritoriality has no application.  Although this
Court has never before considered the application of the Copyright Act to
trans-national infringement like that present here, other courts and
commentators agree that copyright holders' exclusive rights apply to all

4

performances transmitted for receipt inside the United States, no matter where the transmissions begin. The text of the Copyright Act makes this clear. And compelling public policy considerations show why this Court should adopt the same reading of the Act: protecting the rights Congress has reserved for copyright owners requires that unauthorized performances transmitted for receipt inside the country be actionable, regardless of whether those performances originate within the U.S.

TVP also incorrectly contends that the district court's finding that it directly infringed SEI's right of public performance should be reversed because a separate "volitional conduct" requirement applies to claims of direct copyright infringement. TVP claims it did not act volitionally in transmitting performances of the works at issue because its users initiated the performance through the service's automated video-on-demand system. These contentions are wrong for a number of reasons. First, the Copyright Act nowhere articulates a "volitional conduct" element, for infringement of the public performance right or of any of the exclusive rights protected by the Act. At most, direct copyright infringement requires proof of causation, as is the case with any tort. Second, in a public performance case analogous to this one, the Supreme Court rejected the very same argument. Third, courts agree that a defendant cannot escape liability for direct copyright infringement by automating the steps taken to commit the infringement—the key to liability is

5

a defendant's conduct and whether it causes infringement, not whether the steps were carried out by humans or software.  Fourth, as a video-on-demand service provider that selects and transmits the programming made available to internet users, TVP engages in conduct that is uniformly considered to constitute direct infringement, no matter the causation or volition test used.

**ARGUMENT**

I.   **UNITED STATES COPYRIGHT LAW APPLIES TO PUBLIC PERFORMANCES TRANSMITTED FOR RECEIPT WITHIN THE UNITED STATES.**

A. **U.S. Copyright Law Protects the Performance Rights of Copyright Owners in Performances Transmitted for Receipt Inside the United States.**

The Copyright Act protects the exclusive right of copyright owners to "perform" and "display [a] copyrighted work publicly."  17 U.S.C. § 106.  *See also id.* § 101 ("to perform or display a work 'publicly' means . . . to transmit or otherwise communicate a performance or display of the work . . . to the public, by means of any device or process, whether the members of the public capable of receiving the performance . . . receive it in the same place or in separate places and at the same time or at different times"; to "transmit" a performance means "to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent").  The district court correctly held that, when TVP's unauthorized performance

6

of SEI's copyrighted work "commenced abroad but was completed in the United States," it was not "wholly extraterritorial, and thus the Copyright Act covered [TVP's] conduct." [A1141]. Although this is a question of first impression in this Court, the district court's conclusion was correct and should be affirmed.

As one leading copyright treatise concludes, "a straightforward application of the statute" subjects unauthorized performances transmitted for viewing inside the country to copyright liability. 5 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 17.02 (rev. ed. 2017). "Regardless of how much infringing conduct may or may not occur abroad, when violation of one of the exclusive rights in copyrighted works is completed within the United States, the activity becomes actionable under domestic law." *Id.*

While the Copyright Act does not apply to "wholly extraterritorial" infringement, *Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.*, 24 F.3d 1088, 1095 (9th Cir. 1994) (en banc), that rule has no application here. The Nimmer treatise explains that analyzing the territorial scope of the Copyright Act requires drawing "a distinction . . . between purely extraterritorial conduct, which is itself nonactionable, and conduct that crosses borders, so that at least a part of the offense takes place within the United States." 5 *Nimmer on*

7

*Copyright* § 17.02. An infringing act is not "'extraterritorial' simply because it involves foreign acts or parties." Jane C. Ginsburg, *Extraterritoriality and Multiterritoriality in Copyright Infringement*, 37 Va. J. Int'l L. 587, 588 (1997). To the contrary, "extraterritoriality" in the sense relevant to statutory interpretation means something different and specific: "the application of one country's laws to events occurring outside that country's borders." *Id.* "Coverage of acts that commence or take place in part within the borders of the country whose law is applied . . . is not 'extraterritorial' in this sense." *Id.* (emphasis omitted).

Courts that have considered this question have agreed that acts in violation of copyright owners' exclusive rights that occur inside the United States are subject to U.S. copyright law, both with respect to the public performance right at issue in this case as well as the public display right. Courts have appropriately concluded that unauthorized performances or displays transmitted for receipt inside the United States violate both rights, no matter where those transmissions originate.

For example, in *Twentieth Century Fox Film Corp. v. iCraveTV*, 2000 WL 255989 (W.D. Pa. Feb. 8, 2000), a Canadian company captured United States broadcast television programs over the air and retransmitted them via

8

Internet streaming that was accessible for viewing in the United States. *Id.* at *2. The court concluded that the defendants were "unlawfully publicly performing plaintiffs' copyrighted works in the United States." *Id.* at *7. Because the defendants were "transmitting (through use of 'streaming' technology) performances of the works to the public," those infringements "occur[ed] in the United States and violate[d] the U.S. Copyright Act." *Id.*

Similarly, in *Los Angeles News Service v. Conus Communications Co.*, 969 F. Supp. 579 (C.D. Cal. 1997), the court concluded that the Copyright Act applied to an infringing performance that originated outside the country because it was transmitted for viewing inside the United States. In that case, the Canadian Broadcasting Corporation (CBC) broadcast programs in Canada that contained clips of aerial video of the 1992 Los Angeles riots without the permission of the news service which recorded and owned the videos. *Id.* at 581-82. The Canadian broadcast of these programs "spill[ed]" over the border into the United States and were available for U.S. residents to view them. *Id.* at 582. The CBC argued "that because it broadcast[] its programming from Canada to residents of Canada," it was not subject to U.S. copyright law. *Id.* at 583. The court disagreed: "The copyright laws prohibit the unauthorized performance or 'display' of copyrighted audiovisual works. The Copyright Act

9

of 1976 made clear that the display of a copyrighted work includes the showing of its image by television broadcast. Under the plain language of the Act, the subject footage was 'displayed' on television sets within the United States within the meaning of the Copyright Act." *Id.* (citations omitted). *See also Crunchyroll, Inc. v. Pledge*, 2014 WL 1347492, at *17 (N.D. Cal. Mar. 31, 2014) (where videos uploaded outside the United States were "transmitted . . . [to] thousands of viewers in the United States," they were "not wholly extraterritorial" and subject to U.S. copyright law); *Shropshire v. Canning*, 809 F. Supp. 2d 1139, 1145 (N.D. Cal. 2011) (same).[1]

In each of these cases, the court held that copyright liability turns on whether allegedly infringing acts violate copyright holders' exclusive rights inside the United States. And each concluded that unauthorized performances or displays of copyrighted works transmitted for receipt inside the country violate copyright owners' rights. As these courts concluded, unauthorized performances transmitted for domestic viewing infringe copyright owners' exclusive rights in the U.S., no matter where the transmissions originated.

---

[1] The Ninth Circuit, in *Perfect 10, Inc. v. Visa International Service Association*, 494 F.3d 788, 794 (9th Cir. 2007), also assumed that U.S. copyright law could apply when images hosted on "websites based in several counties" were displayed for viewing inside the United States.

10

**B. The Text and Purpose of the Copyright Act Support Applying U.S. Copyright Law to Unauthorized Public Performances Transmitted for Receipt Inside the United States.**

The courts' uniform treatment of unauthorized performances transmitted for receipt inside the United States follows from the text and structure of the Copyright Act. Applying U.S. copyright law to infringing activity like TVP's here is the only way to advance the policy goals that inspire the Act as a whole.

The plain language of the Act leaves no room for doubt. "The owner of copyright . . . has the exclusive right[] . . . to perform the copyrighted work publicly." 17 U.S.C. § 106(4). "Anyone who violates any of the exclusive rights of the copyright owner . . . is an infringer of the copyright." *Id.* § 501(a). The Act does not eliminate copyright holders' exclusive rights to perform copyrighted works publicly when performances transmitted for receipt inside the United States originate elsewhere. Nor does the Transmit Clause provide that public performances take place only when transmission begins and ends within the country. The contrary reading would hamper the Act's ability to combat streaming services that can easily violate a copyright owner's exclusive rights by transmitting across a border. Limiting the Act's scope to infringement originating domestically–even when foreign-originating

11

infringing acts enter into and are received within the United States–would rewrite the statute to invent a restriction that Congress neither intended nor imposed.  And this natural reading of the Act does not run afoul of the rule that U.S. copyright law does not apply extraterritorially because a performance available within the United States is not "extraterritorial" at all.

Limiting copyright protection based on where the infringing act originated would also increase the harm from foreign-hosted, online infringement and significantly undermine the protections and policy goals that the Copyright Act was enacted to protect.  Such a rule "would leave a substantial loophole in the copyright laws.  Broadcasters could deliberately transmit potentially infringing material from locations across the U.S. borders for display in the United States without regard to the rights of copyright owners set forth in the U.S. Copyright Act." *Conus*, 969 F. Supp. at 583-84.  Piracy of motion pictures, video programming, and recorded music via foreign-based online streaming services is a large and growing problem.  Reviewing online marketplaces "that reportedly engage in and facilitate substantial copyright piracy," the Office of the United States Trade Representative noted one study finding that "three quarters of all pirated movie and TV-show traffic (57 billion of 78 billion site visits across 14,000 of the largest global piracy sites)

12

went to streaming sites," which can have a "broad impact . . . on geographically diverse markets." *Notorious Markets*, *supra*, at 1, 8, 11 n.18. Shutting down liability under United States copyright law simply because the first step of infringement originates outside the United States would strip copyright owners of the protections Congress intended the Copyright Act to provide and reward bad actors who would cross borders to evade copyright enforcement.

No serious countervailing policy considerations justify withholding copyright protections when transmissions originating abroad violate copyright owners' exclusive public performance rights inside the United States. For that matter, if infringing acts were exempt from copyright adjudication simply because they began outside the United States, "no transnational tort claim could be adjudicated because the origin and impact of the harm would be in different countries." Ginsburg, *Extraterritoriality*, 37 Va. J. Int'l L. at 588. U.S. copyright law must apply to all infringing activity within the United States, regardless of where it originated, or otherwise its efficacy will be severely undermined.

## II.  THERE IS NO "VOLITIONAL CONDUCT" REQUIRE-MENT THAT EXCUSES A DEFENDANT FROM DIRECT COPYRIGHT INFRINGEMENT LIABILITY FOR OPERAT-ING A VIDEO-ON-DEMAND SERVICE.

TVP contends that it should be excused from liability for copyright infringement in this case because (1) a claim of direct infringement of the public performance right requires proof of "volitional conduct" on the part of the defendant and (2) the purported "volitional conduct" requirement "bars a finding of infringement where the defendant operates an automatic content delivery system" and "the user, not the defendant, selects the content it will view or receive and actuates the delivery system."  TVP Br. 25.

These contentions are wrong.  First, nothing in the Copyright Act requires proof that a defendant acted "volitionally" to be liable for direct infringement.  Second, the Supreme Court has rejected the very same arguments in the specific context of infringement of the public performance right by transmitting programming to users over the internet.  Third, a defendant's automation of infringing activities does not excuse it from direct-infringement liability.  Fourth, a defendant's operation of a video-on-demand service providing programming the defendant itself has chosen for viewers to choose from satisfies *any* causation or volition standard for liability for direct copyright infringement.

14

## A. Establishing Direct Copyright Infringement Requires, at Most, Proof of Causation, Not "Volition."

Copyright is a strict liability statute. "To establish infringement," only "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).[2] This Circuit recognizes this long-standing test. *See Stenograph L.L.C. v. Bossard Assocs., Inc.*, 144 F.3d 96, 99 (D.C. Cir. 1998) (quoting *Feist*).

Neither this traditional test, nor anything in the text or legislative history of the Copyright Act, requires "volitional conduct" or any other additional element to establish direct copyright infringement. There is no need for this Court to recognize any such additional element to assess the district court's finding that TVP was liable for infringement of the public performance right under 17 U.S.C. § 106(4).

In a widely cited 1995 opinion, *Religious Technology Center v. Netcom On-Line Communication Services, Inc.*, 907 F. Supp. 1361 (N.D. Cal. 1995) ("*Netcom*"), the U.S. District Court for the Northern District of California addressed the question of responsibility for direct infringement in the online environment. At the time, Congress had not yet enacted the safe harbor

---

[2] "The word 'copying'" in *Feist* "is shorthand for the infringing of any of the copyright owner's . . . exclusive rights." *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001) (internal quotation marks omitted).

15

provisions of the Digital Millennium Copyright Act that, under certain circumstances, afford protection to services including internet service providers ("ISPs"), storage providers, and search engines.[3]   The court accordingly tackled the question of when it was appropriate to expose ISPs to liability for the incidental copies made in the course of operating services for copying, distributing, and transmitting files sent and received by users— processes the court characterized as "necessary for the functioning of the Internet."  907 F. Supp. at 1372.  In distinguishing between potential service-provider liability for direct and indirect copyright infringement, the court observed with regard to direct infringement that "[a]lthough copyright is a strict liability statute, there should still be some element *of volition or causation* which is lacking where a defendant's system is merely used to create a copy by a third party."  *Id.* at 1370 (emphasis added).[4]

---

[3] *See* 17 U.S.C. § 512.

[4] Under doctrines of secondary liability—namely, inducement, contributory infringement, and vicarious infringement—defendants may be secondarily liable for facilitating infringements committed by direct infringers.  *See, e.g.*, *MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930, 931, 934 (2005).  Here, the district court found TVP liable for only direct infringement.  Accordingly, TVP's attempt to invoke the "substantial noninfringing use" defense articulated by the Supreme Court in *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 442 (1984) (TVP Br. 28-31), is unavailing.  That defense is potentially available only to *secondary* infringement claims of contributory liability, and only in certain circumstances not applicable here, *see Napster*, 239 F.3d at 1022.

Whether a claim alleging direct infringement of any of the exclusive rights set forth in 17 U.S.C. § 106 in fact requires proof of "volition or causation" is a question of first impression in this Circuit.  Since the 1995 *Netcom* decision, a number of courts have wrestled with this question in a variety of contexts.  Courts and commentators have disagreed over whether a volitional conduct requirement exists and, if it does exist, what it means. *Compare Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 131 (2d Cir. 2008) ("*Cablevision*") ("volitional conduct is an important element of direct liability"), *with Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 55 (1st Cir. 2012) (noting that the "'volitional act' position" had been raised in other circuits with only "varying degrees of success," and refraining from deciding whether such a requirement exists for a reproduction right claim), *and* 4 *Nimmer on Copyright*, § 13.08[C] (disagreeing with *Cablevision*'s logic and describing the case's "reference to volition as an 'element'" of a copyright claim as contrary to "[l]egions of cases, up to the Supreme Court level"); *see also* Rebecca Giblin & Jane C. Ginsburg, *We (Still) Need To Talk About* Aereo*: New Controversies and Unresolved Questions after the Supreme Court Decision*, 38 Colum. J.L. & Arts 109, 143 (2015) ("Whether or to what extent 'volition' is in fact a predicate to a finding of infringement . . . invites debate.").

———————————————

17

*Cablevision* itself, which found a "volitional conduct" requirement for infringement of the Section 106(1) reproduction right, cautioned that such a requirement would not necessarily extend to claims of infringement of the Section 106(4) public performance right because "[t]he definitions that delineate the contours of the reproduction and public performance rights vary in significant ways.  For example, the statute defines the verb 'perform' . . . but not the verbs 'reproduce' or 'copy.'"  536 F.3d at 134 (citation omitted).  Indeed, there is not a single case at the appellate court level or higher applying a "volition" element to a claim of direct infringement of the public performance right.

Moreover, the Second Circuit's *Cablevision* decision has been criticized for suggesting that a requirement that a defendant act with "volition" could in some circumstances mean that "liability for direct infringement be imposed only on the individual who presses the 'record' button," 2 Paul Goldstein, *Goldstein on Copyright* § 7.0.2, at 7:8.2-7:8.2-1 (3d ed. Supp. 2017), something that "American copyright law has never required," *id.*

The Nimmer treatise points out that some of the disagreement stems from *Netcom*'s use of the phrase "volition *or* causation."  907 F. Supp. at 1370 (emphasis added).  First, this suggests that, under that court's analysis, *either* volition *or* causation could suffice to establish liability for direct infringement; second, "volition" has been subject to multiple interpretations, including

18

whether an infringing act must involve some mental state, such as being knowing or intentional. Because of such uncertainty, the treatise observed that "[t]hat single reference to 'volition' has caused tremendous ferment." 4 *Nimmer on Copyright* § 13.08[c].

This Court is not bound by *Netcom* or its progeny, and it need not import the "ferment" that has followed into this Circuit in order to resolve this case. To the extent those cases have persuasive value, they are best read, not as establishing a stand-alone "volition" requirement, but rather as requiring sufficient proof of causation, as is the case with any tort.

In fact, after years of disagreement and uncertainty,[5] a consensus may be forming among courts and commentators around this view, that "'the so-called "volition" element . . . is *not* a judicially-created element of intent or knowledge; it is a basic requirement of *causation*.'" *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 666 (9th Cir. 2017) (quoting *Perfect 10, Inc. v. Giganews, Inc.*, 2014 WL 8628034, at *7 (C.D. Cal. Nov. 14, 2014)) (emphasis added). As the Ninth Circuit explained recently in *Giganews*: "We wish to emphasize that the word 'volition' in this context does not really mean an 'act

---

[5] *See, e.g.*, *Warner Bros. Entm't Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003, 1011 n.7 (C.D. Cal. 2011) ("'[I]n light of the fact that copyright infringement is a strict liability offense, the Court is not inclined to adopt' . . . the so-called volitional conduct requirement without clear instruction from the Ninth Circuit" (citation omitted)).

of willing or choosing' or an 'act of deciding' . . . . Rather, as used by the court in [*Netcom*], it 'simply stands for the unremarkable proposition that proximate causation historically underlines copyright infringement liability no less than other torts.'" *Id.* at 666 (quoting *Webster's Third New Int'l Dictionary* 2562 (1986) & 4 *Nimmer On Copyright*, § 13.08[C][1]).

The Fifth Circuit recently agreed that the term "volition" "'does not really mean an act of willing or choosing or an act of deciding,'" *BWP Media USA , Inc. v. T & S Software Assocs., Inc.*, 852 F.3d 436, 440 & n.1 (5th Cir. 2017) (quoting *Giganews*, 847 F.3d at 666), *cert. denied*, ___ S. Ct. ___, 2017 WL 3130790 (Oct. 2, 2017) (No. 17-122), and noted that "[a]t the very least, the [Copyright] Act 'requires conduct by *a person who causes in some meaningful way an infringement*,'" *id.* at 440 n.1 (quoting *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 549 (4th Cir. 2004)) (emphasis added).  And finally, in *American Broadcasting Cos. v. Aereo, Inc.*, 573 U.S. __, 134 S. Ct. 2498 (2014), discussed in detail in the next section, in the face of calls from the defendant and the dissent to require "volitional conduct," the Supreme Court held the defendant to be a direct infringer of the public performance right without any need to consider separately the volition issue. *See id.* at 2504.

If establishing direct infringement requires any addition to the traditional test, these courts' treatment of the "volition or causation" question best comports with the strict-liability foundation of the Copyright Act and

avoids importing an ill-defined term like "volition" into the statutory definition of infringement.

### B. A Service That Transmits Programming to Users Over the Internet Satisfies Any Causation Requirement for Violation of the Public Performance Right.

In *Aereo*, the Supreme Court held that a service that transmits near-live television programming to users over the internet directly infringes the public performance right notwithstanding that the transmissions occur only when users access the service and trigger the automated transmission of performances to them. There are no meaningful differences between the service in *Aereo* and TVP's on-demand service that would justify a different result here. [A1125-1130] (describing TVP's video-on-demand service). Such actions satisfy any causation requirement.

As noted above, Section 106(4) grants to a copyright owner "the exclusive right[] . . . in the case of . . . motion pictures and other audiovisual works, to perform the copyrighted work publicly." The defendant in *Aereo* expressly asked the Supreme Court to impose a separate volitional conduct requirement as an element of direct liability for infringement of this right. *See* Br. for Resp. at 19, 40-43, *Am. Broad. Cos. v. Aereo, Inc.*, No. 13-461 (U.S. Mar. 26, 2014). The Court declined to do so. It instead proceeded by asking the following question grounded in the text of the Act: "Does Aereo 'perform' . . . ?" 134 S. Ct. at 2504. Based on a careful analysis of the Act's text

21

and legislative history, the Court concluded that Aereo did perform and was thus liable for direct infringement.

The Court observed that in 1976, Congress amended the Copyright Act "in large part to reject the Court's holdings" in two cases, *Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390 (1968), and *Teleprompter Corp. v. Columbia Broadcasting System, Inc.*, 415 U.S. 394 (1974), which had held that cable companies providing remote antennas and other infrastructure did not "perform" copyrighted works because their role more closely resembled that of viewers receiving signals than of broadcasters sending them. 134 S. Ct. at 2504-05. Specifically, "Congress enacted new language that erased the Court's line between broadcaster and viewer, in respect to 'perform[ing]' a work. The amended statute clarifies that to 'perform' an audiovisual work means 'to show its images in any sequence or to make the sounds accompanying it audible.'" *Id.* at 2505-06 (quoting 17 U.S.C. § 101). The Act's revised language made clear that "*both* the broadcaster *and* the viewer of a television program 'perform,' because they both show the program's images and make audible the program's sounds." *Id.* at 2506 (emphasis in original). The Court further supported its analysis with examination of the text and legislative history of the Transmit Clause, 17 U.S.C. § 101. *See id.*

The legislative history specifically spells out that in a chain of performance transmissions, *all* participants in the chain directly "perform":

22

> Under the definition[] of "perform," . . . "publicly," and "transmit" in section 101, the concept[] of public performance . . . cover[s] not only the initial . . . showing, but also any further act by which that . . . showing is transmitted or communicated to the public. Thus, for example: a singer is performing when he or she sings a song; a broadcasting network is performing when it transmits his or her performance[;] . . . a local broadcaster is performing when it transmits the network broadcast; a cable television system is performing when it retransmits the broadcast to its subscribers; and any individual is performing whenever he or she plays a phonorecord embodying the performance or communicates the performance by turning on a receiving set.

H.R. Rep. No. 94–1476, at 63 (1976).

In light of the Act's text and legislative history, it was "clear" to the Court "that Aereo is not simply an equipment provider. Rather, Aereo, and not just its subscribers, 'perform[s]'" by transmitting performances to users via the internet. 134 S. Ct. at 2506. Because the Act defines infringement of the public performance right as "perform[ing]" a copyrighted work without authorization, proof of unauthorized performance was all that was needed to establish the defendant's direct liability.

The dissent urged the application of a separate "volitional conduct" requirement and a holding that the defendant was not liable for direct infringement because its transmissions were sent by an automated system in response to "volitional" requests made by users. *See id.* at 2512-14, 2516 (Scalia, J., dissenting).[6] But the Court rejected both propositions. It explained

---

[6] The district court here quoted a passage from the *Aereo* dissent asserting

23

that in light of the statute's text and legislative history, evidence that the defendant's system transmitted requested programs "[o]nly . . . in automatic response to the subscriber's request" was "not critical" when establishing liability for direct infringement. *Id.* at 2507. In other words, the Court held that Aereo's *performance* of the copyrighted works by *transmitting* them satisfied the statutory requirement for direct liability without any need to find separately any "volitional" acts by the defendant in connection with individual transmissions.

Thus, to the extent direct infringement requires proof of causation, the *Aereo* Court explained how a defendant causes infringement of the public performance right by its transmission of performances. To the extent the dissent argued that direct infringement requires proof of any other type of "volitional" conduct, the *Aereo* Court rejected such a requirement.

Applying *Aereo* in *Fox Television Stations, Inc. v. FilmOn X LLC*, 150 F. Supp. 3d 1 (D.D.C. 2015), the U.S. District Court for the District of Columbia rejected a defendant's contention that it was not liable for direct infringement because its internet video-on-demand service offered no near-live programming. *See id.* at 30-31. Because, like the service in *Aereo*, the service in *FilmOn X* "performed" by transmitting programming to

---

the existence of a "volitional conduct" requirement but did not label it as coming from the dissent. [A1141].

24

subscribers over the internet, the court held, it was not "necessary to address the 'volitional conduct' requirement" to hold that the defendant directly performed under the Copyright Act. *Id.* at 31-32. For the same reason here, TVP "performs" and is subject to liability for direct infringement.

## C. A Defendant's Automation of Infringing Conduct Is No Defense to Direct Infringement.

TVP argues that it cannot be a direct infringer because the copyrighted works at issue in this case were transmitted to users via its "automatic content delivery system," which delivers programming only when "the user . . . selects the content [he or she] will view or receive and actuates the delivery system." TVP Br. 25. Although TVP may have automated these steps, the district court found that, among other things, TVP operated the video-on-demand service and chose what programming to upload to the service and make available to users. [A1125-1130]. That is sufficient to establish direct infringement because, in whatever ways courts have described the requirement of causation or volition, they agree that a defendant's choice to *automate* its infringing conduct is no defense to direct infringement.

As discussed above, the Supreme Court in *Aereo* specifically rejected the contention that a defendant was excused from liability for direct infringement of the public performance right because its on-demand transmission of television programs to subscribers was automated. *See Aereo*,

25

134 S. Ct. at 2507. Many other courts in many other contexts have also made clear that defendants can be directly liable for copyright infringement when they use software to implement their decisions.

For instance, in *EMI Christian Music Group, Inc. v. MP3tunes, LLC*, 844 F.3d 79 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 2269 (2017), a jury had found the defendant liable for infringing the plaintiffs' copyrights in cover art associated with the plaintiffs' songs and albums, which the defendant's software automatically caused to be displayed on users' computers whenever users selected a song. *See id.* at 96. On appeal, the defendant, citing the Second Circuit *Cablevision* case, asserted that his service "could not have engaged in a 'volitional act' with respect to the cover art infringement because the retrieval of that art was not directed by [his service] MP3tunes but rather obtained from Amazon.com at the direction of the user when the user selected a song." *Id.*; *see id.* at 87 (defendant's software would "automatically go check for . . . cover art" (internal quotation marks omitted)). Also citing *Cablevision*, the Second Circuit rejected that argument, explaining that the evidence showed that the service's software "was *designed* to retrieve one aspect of a copyrighted work (the album art) whenever a user uploaded another aspect of a copyrighted work (the song)." *Id.* (emphasis added). Although the defendant had automated that conduct via software, the conduct "constituted enough evidence, in our view, that copying of the cover art was *directed by*

26

*MP3tunes*, not users," and thus supported the trial court's finding of volition, *id.* (emphasis added).

Similarly, in *Perfect 10, Inc. v. Amazon.com, Inc.*, the Ninth Circuit held that the plaintiff had made a prima facie case that the defendant had directly infringed the display right where the defendant's "*computers* . . . initiate[d] and control[led] the storage and communication" of the plaintiff's images. 508 F.3d 1146, 1160 & n.6 (9th Cir. 2007) (emphasis added); *see also Quantum Sys. Integrators, Inc. v. Sprint Nextel Corp.*, 338 F. App'x 329, 336 (4th Cir. 2009) ("The fact that Sprint's *computers* generated copies and loaded these copies into RAM *automatically* does not absolve Sprint of liability for copyright infringement." (emphasis added)).

As the Goldstein treatise concludes: "It is the [defendant's] concerted steps and their consequences, *not the accident of whether those steps were executed by humans or automatons*, that is the pivot of liability." 2 *Goldstein on Copyright* § 7.0.2. at 7:7-7:8 (emphasis added). TVP's argument that its public performances are automated is therefore no defense to direct infringement.

### D. A Defendant's Operation of a Video-on-Demand Service Where It Selects the Programming Is a Classic Example of Direct Infringement.

Finally, TVP's "volitional conduct" argument ignores that operating an on-demand service in which *it* provides and selects the programming that it

27

transmits for viewers to choose from, TVP Br. 4-5, is uniformly considered to be a prototypical example of direct infringement, regardless of one's view regarding causation or volition.

Thus, in *MP3tunes*, the Second Circuit held that the defendant was liable for direct infringement when it designed a service that chose the album art to display to users who had selected a song. 844 F.3d at 96. Likewise, in *Cablevision*, the Second Circuit expressly contrasted the defendant's service with a video-on-demand service, which would infringe because it "actively selects and makes available beforehand the individual programs available for viewing." *Cablevision*, 536 F.3d at 132. Similarly, in *Society of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29 (1st Cir. 2012), the First Circuit held a defendant directly liable for copyright infringement because, *inter alia*, his "active involvement" in a subordinate's posting of materials to a website included the fact that he "'chose what goes up.'" *Id.* at 56 (emphasis omitted).

Even under Justice Scalia's minority view in *Aereo*, TVP is liable for direct infringement. Writing in dissent, Justice Scalia emphasized that "[v]ideo-on-demand services" in particular can be liable as direct infringers because "*[t]hey choose [and curate] the content. . . .* That selection and arrangement by the service provider constitutes a volitional act directed to specific copyrighted works." *Aereo*, 134 S. Ct. at 2511, 2513 (Scalia, J.,

28

dissenting) (emphasis in original).  Here, TVP chooses and curates the content, and transmits it for viewing by the public as part of its video-on-demand service.  Under any view of a possible "volition or causation" requirement, this makes TVP liable as a direct infringer.

## CONCLUSION

For the foregoing reasons, the Court should rule that U.S. copyright law applies to public performances transmitted for receipt inside the United States and should find that there is no "volitional conduct" requirement.

Respectfully submitted,

/s/ Thomas G. Hentoff
THOMAS G. HENTOFF
CONNOR S. SULLIVAN
WILLIAMS & CONNOLLY LLP
        *725 Twelfth Street, N.W.*
        *Washington, DC 20005*
        *(202) 434-5000*
        *Counsel for Amici Curiae*

OCTOBER 4, 2017

29

**CERTIFICATE OF COMPLIANCE WITH TYPEFACE AND WORD-COUNT LIMITATIONS**

I, Thomas G. Hentoff, counsel for amici curiae and a member of the Bar of this Court, hereby certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B), that the attached Brief of Amici Curiae in Support of Plaintiff-Appellee, is proportionately spaced, has a typeface of 14 points or more, and contains 6,404 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

/s/ Thomas G. Hentoff
THOMAS G. HENTOFF
*Counsel for Amici Curiae*

OCTOBER 4, 2017

## CERTIFICATE OF SERVICE

I, Thomas G. Hentoff, counsel for amici curiae and a member of the bar of this Court, certify that, on October 4, 2017, a copy of the attached Brief of Amici Curiae in Support of Plaintiff-Appellee was filed electronically through the appellate CM/ECF system with the Clerk of the Court. I further certify that all parties required to be served have been served.

s/ Thomas G. Hentoff

THOMAS G. HENTOFF
*Counsel for Amici Curiae*

OCTOBER 4, 2017